GOLDEN BEAR INTERNATIONAL,
INC., Plaintiff,

v.

BEAR U.S.A., INC., Defendant.

Civil Action No. 1:96–CV–579–JTC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 13, 1996.

Dale Lischer, Stephen M. Schaetzel, Holmes J. Hawkins, III, Felipe Jose Farley, Jones & Ashew, Atlanta, GA, for Plaintiff.

Edmund B. Burke, John Howard Fleming, John L. North, Ann Grunewald Fort, Sutherland Asbill & Brennan, Atlanta, GA, Timothy J. Kelly, pro hac vice, Pasquale A. Razzano, pro hac vice, Victor J. Geraci, pro hac vice, Fitzpatrick Cella Harper & Scinto, New York City, for Defendant.

### ORDER

CAMP, District Judge.

This matter is before the Court on Plaintiff's Motion for a Preliminary Injunction (# 3–1). The record consists of live testimony and documentary exhibits admitted at an evidentiary hearing held on October 30, 1996, as well as declarations, depositions, and other exhibits designated by the parties. The Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

#### A. THE CLAIM

1. This action was initiated on March 6, 1996, when GBI filed a Verified Complaint and a Motion for Preliminary Injunction against Bear USA. Plaintiff filed a motion to amend its complaint on May 13, 1996.

2. Plaintiff charges Defendant with trademark infringement, unfair competition, and dilution under federal law, with deceptive trade practices, unfair competition, and dilution under Georgia law, and with unfair competition under common law. Plaintiff's Motion for Preliminary Injunction seeks to enjoin further use of Defendant's logo in connection with the sale and advertising of Defendant's products.

#### B. THE PARTIES AND THEIR TRADE-MARKS

4. Plaintiff, Golden Bear International, Inc. ("GBI") is a Florida corporation with its principal place of business in North Palm Beach, Florida.

5. Defendant Bear U.S.A., Inc. ("Bear USA") is a New Jersey corporation with its principal place of business in Norwood, New Jersey.

6. GBI is the owner of the Golden Bear wordmark and Golden Bear logos. GBI owns two federal trademark registrations claiming the design of a bear (Reg. No. 1,035,090 and Reg. No. 1,845,165). GBI has pending applications for the Golden Bear mark and the Bear design (74/166,954 and 74/670,864).

7. GBI adopted a new Golden Bear logo in 1991. The Golden Bear logo creates the same commercial impression as the original Golden Bear logo and succeeds to the goodwill associated with the original logo.

8. The business of GBI is the exploitation of the name and likeness of Jack Nicklaus through licensing its trademarks, including the Golden Bear marks.

9. Jack Nicklaus is a renowned golfer, perhaps the most successful golfer in the history of the sport. Mr. Nicklaus was nicknamed "The Golden Bear" in approximately 1961. Shortly thereafter, he began wearing the Golden Bear logo and promoting products bearing the Golden Bear marks. He has worn clothing and caps bearing the Golden Bear logo in major golf tournaments continually since 1962. He also wears the logo during other public appearances.

10. The licensees of GBI have sold a number of products bearing the Golden Bear mark since 1962, including clothing, credit cards, automobiles, paintings, and golfing equipment. The majority of the products sold with the Golden Bear marks are either

golfing equipment or sportswear and clothing associated with golf or the lifestyle of golf.

11. GBI exercises control over the quality of the merchandise sold by its licensees and the content of advertising for goods bearing the Golden Bear marks.

12. GBI licensees sell clothing bearing the Golden Bear marks through men's shops, golf centers, resorts, on–course and off–course golf· shops, and department stores, such as Macy's, Dillard's, and Burdine's.

13. Since 1962, approximately $1.2 billion of merchandise has been sold in the United States bearing the Golden Bear logo, Clothing bearing the Golden Bear logo of a retail value of approximately $800–900 million has been sold in the United States since 1962. According to the Declaration of Robert Shell, GBI has sold in excess of $10 million in clothing since 1988. GBI and its licensees have spent approximately $35 million worldwide for advertising products bearing the Golden Bear logo since 1962.

14. The Golden Bear logo is associated with Jack Nicklaus. The use of the words "Golden Bear" suggest Jack Nicklaus to those familiar with golf or sports. The Golden Bear marks are usually used in conjunction with the name "Jack Nicklaus."

15. GBI intends to convey through its advertising and promotion the association with Jack Nicklaus, his wholesome image, his accomplishments, and his excellence as an athlete.

16. Bear USA is a manufacturer, importer, distributer and seller of clothing products including parkas, jackets, hats, and footwear. Since September 1994, Bear USA has continuously used, in connection with the sale of its clothing, a trademark consisting of a stylized bear in combination with one of the following company identifiers: "BEAR" or "BEAR U.S.A." In early 1996, Bear USA, modified its trademark to incorporate the company name "BEAR", into the design of the bear. The express purpose of the change was to prevent counterfeiting. The more recent logo succeeded to the goodwill of the older version of the trademark.

17. Bear USA has applied to the PTO to register both the older and newer versions of its marks. (U.S. Serial Nos. 74/802,359, 74/556,228, 74/625,218, and 74/625,219.) The older trademarks have been examined by the PTO which has determined that no similar registered or pending trademark was found in the PTO records which would bar registration of these marks.

18. Bear USA's products are intended to meet the demands of the "hip–hop" consumer and are sold primarily to an inner–city market. The products consist primarily of high quality down filled parkas, heavy boots, technical sports jackets, and related apparel. The clothing is oversized and brightly colored.

19. Bear USA's products are sold in department stores such as Macy's, Rich's, Stern's and Modell's, as well as small inner-city retail outlets.

20. Bear USA sold $1 million worth of merchandise in 1994, $10 million in 1995, and an estimated $15 million in 1996. Bear USA has expended $276,000 in advertising and promoting products with its logos since September, 1994.

## C. THE TYPE. STRENGTH AND DISTINCTIVENESS OF THE GOLDEN BEAR MARK

21. Plaintiff's Golden Bear logo is distinctive because of its stylized rendition. Plaintiff's Golden Bear marks have been continuously and extensively used for 34 years. Although the marks do not describe any particular type of clothing, their value is in their suggestive connection with Jack Nicklaus. The marks are usually used with the term "Golden Bear" or "Golden Bear by Jack Nicklaus."

22. Neither the word BEAR nor a design of a bear is unique in the clothing field. Numerous third parties hold federal trademark registrations in the clothing field for designs of bears. Both S. Slater and Sons and the University of California, Berkeley, used the name "Golden Bear" on clothing prior to GBI's use. The University of California, Berkeley, has also made use of a design of a golden bear in profile.

23. The trademark search firm of Thompson and Thompson conducted a search of the PTO which revealed numerous third party trademark registrations containing "Bear" or a representation of a bear. These registrations were located in the class which covers clothing and footwear.

24. Plaintiff's Golden Bear wordmark, as distinguished from the logo, is not federally registered and is subject to a concurrent proceeding in the U.S. Patent and Trademark Office (PTO).

25. Plaintiff's mark is well known and recognized by consumers familiar with the sport of golf and golfing–related activities, but Plaintiff has produced no direct evidence that consumers in general recognize its Golden Bear mark. No evidence indicates that Plaintiff's mark is recognized in the trading areas and channels of trade used by Defendant.

## D. SIMILARITY OF THE PARTIES' MARKS

26. The sound of the two marks is not confusingly similar. Plaintiff refers to its logo as The Golden Bear and usually the term Golden Bear appears with its logo. Defendant's logo always incorporates the term Bear USA.

27. The appearance of the Bear logos is somewhat similar. They are both standing, four–footed, bear profiles. On the other hand, the fact that Defendant incorporates "Bear USA" into the design of its logo distinguishes the appearance of the two. Furthermore, Plaintiff's logo appears to be a rendition of a stationary bear while the bear in Defendant's logo appears to be moving. In addition, the two bears face opposite directions.

28. Considering the marks as a whole, each conveys a somewhat different meaning. Plaintiff's mark suggests the Golden Bear, Jack Nicklaus, and the qualities associated with Mr. Nicklaus' career. The Defendant's mark, which appears to be a polar bear design, is intended to suggest the warmth and strength of its major products, which are parkas and other outerwear.

29. Of some importance is the fact that the old Bear USA marks were examined by the PTO and the determination made that no similar registered or pending trademark was found in the PTO records which would bar their registration.

## E. THE PRODUCTS

30. Although the Golden Bear mark has been used on other products, GBI's concern in the present litigation mainly relates to the clothing lines. The clothing sold under the GBI's trademarks appears to consist mostly of blazers, slacks, shirts, sweaters, and some accessories. Bear USA also sells jackets, down filled parkas, heavy boots, technical sport jackets, shirts, and related apparel. Although both lines include similar categories of clothing, the items themselves are dissimilar and not likely to confuse the public with regard to source.

## F. CHANNELS OF TRADE

31. Outlets that handle the clothes bearing the GBI marks are usually men's shops, speciality shops, golf shops, and the like. Outlets which handle the Bear USA line are generally retailers who concentrate on the inner–city market, as opposed to the suburban or country club market. Both GBI and Bear USA sell through the Macy's department store; however, no evidence was presented that indicated that any single Macy's store handled both Plaintiff's and Defendant's lines.

32. The Golden Bear mark is very recognizable in its market area. However, since Bear USA sells to different customers largely through different retail outlets, no evidence in the record exists to indicate the degree of recognition of the Bear USA mark in Golden Bear's market or vice versa.

33. In summary, the products of Plaintiff and Defendant flow through different channels of trade to different market groups.

## G. ADVERTISING AND PUBLICITY

34. The most effective promotion of GBI products is Jack Nicklaus' public appearances wearing clothing with the Golden Bear logos. GBI also advertises in "Golf Maga-

zine." Its licensees run numerous ads in local markets which associate their goods with Jack Nicklaus.

35. Bear USA spends much less in advertising and promotion than Plaintiff. Bear USA has placed only two advertisements, both in a magazine entitled "The Source." Bear USA has supplied clothing to wardrobe managers who in turn supplied the clothing to rap artists. Rap singers subsequently wore Defendant's clothing during performances. Also, wardrobe managers have purchased clothing from Bear USA for rap groups such as Dr. Dre, Skoob, and Junior M.A.F.I.A. who modeled the clothing in editorial pieces for certain magazines such as *Vibe* Magazine and *Source* Magazine.

## H. INTENT OF DEFENDANT

36. Robert Hong, Vice–President of Defendant, made the decision to adopt a bear as a logo for his business. The original logo was a "Bear Mountain" logo. At the time Mr. Hong made this decision, he was not a golfer and was not aware of the Golden Bear logo.

37. The bear was chosen by Mr. Hong because of a number of personal associations and because the bear represented strength and beauty.

38. The original Bear Mountain logo was not intended as a marketing logo, but as a private label in Defendant's family–run store. The predecessor of the present logo was chosen in 1994 when Defendant was incorporated.

39. At that time, Defendant was aware of the Golden Bear logo, and viewed a trademark search which indicated a number of uses of the word or image of a bear in various marks. Mr. Hong testifies that he obtained by telephone the oral opinion of his attorney that there was no prior mark that would prevent the adoption of the Bear USA logo. However, Mr. Hong has no written opinion or other documentation of an opinion from his attorney upon which he relied.

40. In summary, no evidence in the record indicates Bear USA intended to copy GBI marks or trade on GBI's reputation.

## I. ACTUAL CONFUSION OR ASSOCIATION OF THE MARKS IN THE PUBLIC'S MIND

41. No evidence of actual confusion exists in the record.

42. Furthermore, no direct evidence exists that consumers familiar with the Golden Bear mark will associate Defendant's mark with it. The only evidence is the inference that can be drawn from the alleged similarities of the marks. As discussed above, the similarities, are not compelling.

43. Finally, the parties' respective goods are relatively expensive for items of clothing. Therefore, when members of the public deal with the parties' goods, they are likely to exercise a high degree of care.

## J. IRREPARABLE INJURY TO PLAINTIFF

44. Plaintiff alleges that Bear USA's logos are confusingly similar to the Golden Bear logos and are likely to cause confusion of the purchasing public. Plaintiff also alleges that there will be blurring and tarnishment of its logo by the Bear USA logo. Plaintiff bases this tarnishment claim on the fact that certain rap performers have occasionally appeared in print or in public wearing clothing with the Bear U.S.A. logo.

45. Although the Bear USA logo had been in use since 1994, no one associated with Plaintiff was aware of its existence until its was called to Plaintiff's attention in August 1995 by a "watch service" which they employed. Approximately eight months later, GBI filed the Complaint in this case.

46. Plaintiff has not produced any evidence of actual confusion by members of the consuming public. In addition, Plaintiff has produced no direct evidence that the Bear USA mark would suggest the Golden Bear mark to consumers who are familiar with the Golden Bear mark.

47. No evidence indicates Plaintiff has lost any sales as a result of Defendant's use of its mark.

48. With regard to Plaintiff's allegation that the use of clothing bearing the Bear USA logo by certain rap musicians will tar-

nish the Golden Bear mark, the record presents evidence that rap musicians have appeared in print or in public wearing the Bear USA logo on a few occasions. None of these occasions was for the purpose of promoting or endorsing the Bear USA line of clothing. Plaintiff has produced no evidence which indicates that rap stars are perceived by the public as representing Bear USA.

49. In summary, little evidence exists of ongoing injury to Plaintiff which would require emergency relief.

## K. *RELATIVE HARM WHICH AN INJUNCTION WILL ' CAUSE DEFENDANT*

50. Defendant recently changed the design of its Bear USA logo in order to prevent counterfeiting. The change of a logo invariably causes concern with retailers. A further change would cause retailers handling Defendant's products to doubt Defendant's reliability.

51. Defendant's business has grown rapidly in the last two years. A change in its logo would deprive it of the goodwill and reputation which have become associated with the Bear USA mark.

52. Changing to a new logo, although physically possible, would amount to requiring the company to start over. In its first year of sales, Bear U.S.A. had $400,000 in sales, whereas during 1996, it had $15 million of sales. Forcing Bear U.S.A. to change its logo could cost the company millions of dollars in lost sales and could ruin Bear U.S.A.'s business.

## CONCLUSIONS OF LAW

### A. *JURISDICTION AND VENUE*

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1338(a) and (b). Since Plaintiff asserts claims under the trademark laws of the United States, 15 U.S.C. § 1051, et seq.

### B. *PRELIMINARY INJUNCTION STANDARD*

2. The moving party seeking a preliminary injunction must demonstrate:

(a) A substantial likelihood that it will prevail on the merits of its case;

(b) That it will suffer irreparable injury if the preliminary relief is not granted;

(c) That the threatened injury to it outweighs whatever harm the injunction may cause the Defendant; and

(d) The injunction must not disserve the public interest.

*Swatch Watch, S.A. v. Taxor, Inc.*, 785 F.2d 956, 958 (11th Cir.1986). A preliminary injunction is an extraordinary remedy, and the Court should exercise its discretion to grant an injunction only if the moving party clearly satisfies the four prerequisites. *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352, 1354 (11th Cir.1983).

### C. *IRREPARABLE HARM*

3. Plaintiff must establish that it will suffer irreparable injury if the Court does not grant the injunction. "Irreparable injury" means injury for which a monetary award cannot be adequate compensation. *Cunningham v. Adams*, 808 F.2d 815 (11th Cir.1987).

4. Dilution of Plaintiff's mark either by blurring its distinctiveness or by tarnishing its image would be an irreparable injury; however, Defendant's products are of a high quality and sold to a different market that Plaintiff's. No evidence in the record indicates that prospective purchasers of Plaintiff's products make a mental connection between Plaintiff's mark and the mark used by Defendant.[1]

5. The Court concludes that the present record does not show tarnishment of Plaintiff's marks. Plaintiff alleges that the use of Defendant's products by certain rap musicians somehow tarnishes the image of the

---

1. Defendant has submitted the results of a survey in order to establish the lack of similarity between the marks at issue. Plaintiff has contested the methods that Defendant's expert used in conducting this survey. The results of this survey were not essential to determining whether Plaintiff has established a "likelihood of success on the merits" or "irreparable injury". Therefore, this Court did not rely on the survey results in making these findings of fact and conclusions of law.

Golden Bear marks; however, the occasional use by rap stars is unlikely to cause the public to associate Jack Nicklaus or Golden Bear with the colorful or even offensive lyrics of rap stars.

6. The Court further notes that Defendant's logo had been in use for well over a year before it even came to the attention of Plaintiff, and then only through a paid "watch service." Plaintiff then delayed approximately eight months before seeking immediate relief. Preliminary injunctions are issued to prevent imminent and inevitable injury to the movant, and undue delay "speaks volumes about whether a plaintiff is being irreparably injured." *Borden, Inc. v. Kraft, Inc.*, 224 USPQ 811, 822 (N.D.Ill.1984).

7. In summary, the Court finds that Defendant's continued use of its logo pending a final hearing on the merits is not likely to irreparably damage Plaintiff.

## D. *BALANCE OF THE HARMS*

8. Plaintiff must also show that the threatened injury to Plaintiff outweighs whatever damage the injunction may cause to Defendant. As discussed above, requiring Defendant to change its logo at this time could significantly impact Defendant's business. Such a change would result in the loss of goodwill and possibly cause the failure of Defendant's business. On the other hand, Plaintiff does not even argue that Defendant's continued use of its logo could fatally impact Plaintiff's business. Thus, the potential harm to Defendant outweighs the risk of injury to Plaintiff pending the trial on the merits.

## E. *PROBABILITY OF SUCCESS*

9. Plaintiff must show a substantial likelihood that it will prevail on the merits in order to obtain an injunction. " 'Probability of success' implies that the moving party ... must have a very clear and strong case." McCarthy, *Trademarks and Unfair Competition*, 3d Ed, § 30.17 (1995).

10. The test of federal trademark infringement is whether there is a "likelihood of confusion" as a result of Defendant's activities. Similarly, an unfair competition claim under § 43(a) of the Lanham Act also depends on establishing a likelihood of confusion. The Court should review the following factors to determine whether a likelihood of confusion exists between the two trademarks:

(1) The type of mark;

(2) Similarity of design;

(3) Similarity of the product;

(4) Identity of retail outlets and purchasers;

(5) Similarity of advertising media;

(6) The intent of Defendant; and

(7) Actual confusion.

*John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 972 (11th Cir.1983) and *Swatch*, 785 F.2d at 958.

11. In terms of these factors, Plaintiff's case does not represent a "very strong case" of trademark infringement. There are significant differences as well as some similarities between the Golden Bear and the Bear USA marks. Even though both Plaintiff and Defendant sell clothing products, the individual items differ substantially. Plaintiff and Defendant sell through different retail outlets to different purchasers. No evidence exists that Defendant intended to take advantage of Plaintiff's goodwill. Nor does any evidence of actual confusion exist.

12. Under 43(c) of the Lanham Act, GBI is entitled to an injunction (1) if the Golden Bear logo is a "famous" mark and (2) if Bear USA's use of its logo dilutes the distinctive quality of the Golden Bear logo. 15 U.S.C. § 1125(c). A similar analysis applies to Plaintiff's dilution claim under Georgia law except that the Georgia Antidilution Statute applies even if Plaintiff's mark is not "famous". O.C.G.A. § 10–1–451(b).

13. In determining whether a mark is "famous", the Court should consider the factors listed in the Antidilution Statute:

(1) The distinctiveness of Plaintiff's mark;

(2) The duration and extent of its use;

(3) The duration and extent of advertising and publicity of Plaintiff's mark;

(4) The extent of its trading area;

(5) The channels of trade in which it is used;

(6) The degree of recognition of Plaintiff's mark in its trading areas and channels of trade and those of Defendant;

(7) Third party use; and

(8) Whether Plaintiff's mark is registered.

15 U.S.C. § 1125(c).

■ 14. At this point in the case, whether the evidence establishes that Plaintiff's mark is "famous" is a close question. The Golden Bear logo is a distinctive mark which has been widely used since 1962. The logo has been extensively publicized by Jack Nicklaus, and it is well known to purchasers who are interested in golf and the lifestyle associated with golf. On the other hand, it is not clear that the mark is a famous mark to members of the general public. Plaintiff's mark certainly does not rise to the level of marks such as Exxon, Kodak, and Coca–Cola which have been found to be generally famous. Furthermore, the Golden Bear marks are not likely well known to consumers who purchase Defendant's goods. Finally, third parties have extensively used both the word bear and the design of a bear in connection with the sale of sporting goods and clothes.

■ 15. Similarly, whether Defendant's logo results in the tarnishing or blurring of Plaintiff's mark is also a close question. As discussed above, Plaintiff has produced no evidence that Plaintiff's customers have made, or would make, a connection between the Golden Bear logo and the Bear USA logo. In addition, the fact that rap performers may occasionally wear clothes bearing Defendant's logo is unlikely to create an association in the general public between GBI, or Jack Nicklaus, and these rap performers.

16. Nonetheless, the Court does not need to resolve the merits of Plaintiff's claims. The fact that these claims present close questions is sufficient to support the finding that Plaintiff has not established a "likelihood of success" on the merits.

### F. *PUBLIC INTEREST*

17. Plaintiff must also show that issuing an injunction would not be adverse to the public interest. On the one hand, the public has an interest in preventing the confusion of consumers. The public interest in preventing dilution of famous marks has been enacted in the Federal Antidilution Statute. On the other hand, the potential anti–competitive effect of a broad application of the dilution doctrine requires that it be confined to situations where the protectable interest is clear and the threat substantial. Thus, the public interest requires caution at this preliminary stage of the litigation.

18. In summary, the public interest is not a controlling factor since the Court has neither found a clear likelihood of confusion nor of dilution of Plaintiff's mark.

In conclusion, Plaintiff's Motion for a Preliminary Injunction (# 3–1) is hereby **DENIED**.