AT & T MOBILITY LLC f/k/a
Cingular Wireless LLC,
Plaintiff,

v.

NATIONAL ASSOCIATION FOR
STOCK CAR AUTO RACING,
INC., Defendant.

Civil Action No. 1:07–CV–623–MHS.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 18, 2007.

Colin S. Stretch, Daniel A. Loeffler, James M. Webster, III, Michael K. Kellogg, Kellogg Huber Hansen Todd Evans & Figel, Washington, DC, David Lewis Balser, Nathan Lewis Garroway, Thuy Vu Taitt, McKenna Long & Aldridge, Neal S. Berinhout, Cingular Wireless Associate General Counsel–Litigation, Atlanta, GA, for Plaintiff.

Daniel Perry, David R. Gelfand, Parker H. Bagley, Milbank Tweed Hadley & McCloy, New York, NY, John Howard Fleming, Richard Lance Robbins, Jenifer Elizabeth Niedenthal, Sutherland Asbill & Brennan, Atlanta, GA, for Defendant.

## ORDER

SHOOB, Senior Judge.

This matter came on for hearing on April 26, 2007, on plaintiff's motion for a preliminary injunction enjoining defendant from interfering with plaintiff's right to introduce and feature the AT & T logo and brand in the paint scheme of the # 31 Car in connection with the # 31 Car's participation in NASCAR Cup Series races. After carefully reviewing the briefs, affidavits, and other evidence submitted and considering the arguments of counsel, the Court enters the following findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a). Based on its findings, the Court grants plaintiff's motion.

### FINDINGS OF FACT

A. Background

Plaintiff AT & T Mobility LLC f/k/a Cingular Wireless LLC is a limited liability company whose members are subsidiaries of AT & T Inc. (formerly SBC Communications Inc.) and BellSouth Corporation. On December 29, 2006, AT & T Inc. acquired BellSouth Corporation. In connection with the acquisition, plaintiff has changed its name to AT & T Mobility LLC and is transitioning its trade name, brand, and logos from "Cingular Wireless" to "AT & T."

Defendant National Association for Stock Car Auto Racing, Inc. ("NASCAR") is the sanctioning body of stock car racing. NASCAR each year holds 17 of the top 20 attended sporting events in the United States and has approximately 75 million fans. Internationally, NASCAR races are broadcast in over 150 countries. NASCAR consists of three major national series as well as eight regional series and one local grassroots series. One of NASCAR's highest profile and most visible racing series is known as the "Cup Series."[1]

The # 31 Car races in NASCAR's Cup Series. It is owned by RCR Team # 31, LLC ("RCR") and driven by Jeff Burton.

### B. Plaintiff's Sponsorship of the # 31 Car

In 2001, plaintiff became the primary sponsor of the # 31 Car by entering a sponsorship agreement with RCR ("Sponsorship Agreement"). The Sponsorship Agreement originally ran from 2001–2004, and the parties renewed this agreement to run from 2005–2007. Plaintiff's current agreement with RCR includes an exclusive right to negotiate a renewal beyond 2007. The exclusive negotiation period expires June 1, 2007. Pursuant to this Sponsorship Agreement, the # 31 Car currently features the Cingular brand and logo as part of its paint scheme.

### C. Sprint Nextel's Entry Into Cup Series Racing

Nextel is a subsidiary of Sprint Nextel Corp. and is engaged in the business of providing telecommunications services. On June 17, 2003, NASCAR and Nextel Communications entered into the "Nextel Sponsorship Agreement," which provided that beginning with the 2004 Season, Nextel Communications would become the Official Series Sponsor of the NASCAR NEXTEL Cup Series. Nextel has since merged with Sprint Corporation and has changed its name to Sprint Nextel Corporation ("Sprint Nextel").

The Nextel Sponsorship Agreement granted exclusivity to Sprint Nextel as the sole telecommunications company sponsoring Cup Series races, and Sprint Nextel agreed to pay a publicly reported price of $700 million for its exclusive sponsorship rights over a 10–year period. To implement Sprint Nextel's exclusivity, the Nextel Sponsorship Agreement contained, *inter alia*, a "Category" definition and a list of "Competitors." The parties agreed that Sprint Nextel would receive exclusive sponsorship rights in its Category, which includes wireline and wireless telecommunications services—local and long distance services, wireless services, and two-way radio—and associated equipment such as wireless phones and PDAs (e.g., Palm Pilots). The Nextel Sponsorship Agreement defines "Competitor" to include the companies listed on Schedule 1 of the Agreement. In particular, Schedule 1 identifies Alltel, AT & T, AT & T Corp., AT & T Wireless, SBC Communications, BellSouth and Cingular as Competitors. The Competitors of Sprint Nextel are barred from advertising and sponsorships in connection with NASCAR NEXTEL Cup Series events. Sprint Nextel insisted upon exclusivity in its Category of telecommunications services because it believed that without such rights, a Competitor such as AT & T or Verizon might attempt to enter the sport as a sponsor.

During the negotiation of the Nextel Sponsorship Agreement, the parties were aware that competitors of Sprint Nextel sponsored certain racing teams, including

---

**1.** From 1972–2003, the series was known as the "Winston Cup Series" and was sponsored by R.J. Reynolds Tobacco Company.

RCR's # 31 Car. NASCAR suggested, and the parties incorporated into the Nextel Sponsorship Agreement, narrow exceptions to Sprint Nextel's exclusivity. Schedule 4 of the Nextel Sponsorship Agreement lists those race teams that had pre-existing sponsorship agreements with Sprint Nextel's Competitors and which could be permitted to continue with those sponsorships according to certain terms and conditions. Schedule 4 lists the # 31 Car.

Pursuant to the provisions of the Nextel Sponsorship Agreement that permitted narrow exceptions to Sprint Nextel's exclusivity, NASCAR agreed to take all legally permissible steps to protect Sprint Nextel's exclusivity.

D. The RCR Agreement & Addendum

NASCAR regulates stock car racing through annual contracts between itself and drivers and car owners, known as "Driver and Car Owner Agreements." NASCAR, RCR, and Jeff Burton are parties to a 2007 Driver and Car Owner Agreement ("RCR Agreement").[2] The RCR Agreement implements the exclusivity NASCAR granted Sprint Nextel by preventing RCR from placing "competitive Category ... product or service identification ... on the ... car owner's racing car." RCR Agreement ¶ 4. The RCR Agreement defines "Category" to include, *inter alia*, "wireline and wireless ... communication services." *Id.* at ¶ 11.

However, the RCR Agreement further provides that, "[n]otwithstanding" that exclusivity, "NASCAR and Nextel will allow any and all existing product licensing relationships in the Category to continue through the current term of their agreement." *Id.* An Addendum to the RCR Agreement further explains the exceptions to Sprint Nextel's exclusivity. In the Ad-

dendum, the "Driver/Owner acknowledges that certain existing contractual agreements preclude such Driver/Owner from fulfilling specific requirements of the NASCAR NEXTEL Cup Series 2007 ... Driver and Car Owner Agreement." Addendum at 1.

The grandfather clause of the Addendum is as follows:

4. Grandfather Clause:

To the extent that Driver/Team:

i) has a sponsorship or Driver personal services relationship which precludes such Driver/Team from complying with the 2007 Driver and Car Owner Agreement as set forth above,

(a) such Driver/Team shall have the right to renew such sponsorship and Driver personal services agreement so long as such sponsor shall not increase its brand position on the vehicle, and

(b) if such sponsor fails to renew with undersigned Team, Driver/Team shall not sign a subsequent sponsorship or licensing agreement in the Category; and

ii) has a licensing agreement which is part of the aforementioned sponsorship agreements, such Driver/Team shall have the right to continue to license such products so long as such sponsorship relationship continues.

Addendum ¶ 4.

E. Communications Regarding Plaintiff's Sponsorship of the # 31 Car

On June 26, 2003, representatives of NASCAR met with representatives of plaintiff as well as RCR in Atlanta to discuss the effect of Sprint Nextel's entry into the sport as lead Cup Series sponsor. The parties dispute what was said at this

---

**2.** The parties have entered into this annual agreement without material modification since at least 2004 when Sprint Nextel began sponsoring the Cup Series.

meeting. Plaintiff's position is that NASCAR identified only two limitations on its right to continue its sponsorship relationship with RCR (the same two limitations captured in the RCR Agreement & Addendum): Plaintiff (i) could not increase its brand position on the vehicle, or (ii) move its sponsorship agreement to another racing team. NASCAR's position is that, in addition, it told plaintiff-either at the meeting or shortly after-that although plaintiff would be permitted to continue to sponsor the #31 Car, plaintiff would be confined to the "Cingular Wireless" brand and logo and would not be allowed to use the brand or logo of another telecommunications company on the vehicle. It is undisputed that plaintiff may continue to promote the Cingular brand.

In 2005, Sprint Nextel became concerned about marketplace rumors involving mergers in the telecommunications industry. NASCAR sent RCR a letter dated April 4, 2005, stating that "should Cingular be acquired by a third party, the Cingular brand is continually welcome as a team sponsor. However, should the company's name change, we will not allow any paint scheme or branding on the car/team promoting this new name or a new third party." Bagley Decl., Ex. 14. According to NASCAR, it repeatedly told RCR of this position throughout 2005 and 2006.

In addition, Sprint Nextel and NASCAR negotiated an amendment to the Nextel Sponsorship Agreement which was dated April 4, 2005, but signed in June of 2006. The amendment prohibited NASCAR from allowing a pre-existing competitor, such as plaintiff, to activate their sponsorship under the name of a prohibited competitor.

F. Plaintiff's Proposed Paint Scheme & Litigation

On January 4, 2007, after the merger between AT & T Inc. and BellSouth Cor-

poration, plaintiff submitted a paint scheme for the #31 Car that calls for the Cingular Wireless logo to remain on the hood of the car while introducing the AT & T logo on the rear quarter panel. On January 16, 2007, NASCAR rejected plaintiff's proposed change to the paint scheme.

On March 16, 2007, plaintiff filed a complaint against NASCAR. On March 26, 2007, plaintiff amended its complaint against NASCAR setting forth claims for promissory estoppel, negligent misrepresentation, breach of contract, and breach of the implied covenant of good faith and fair dealing. Plaintiff also sought a declaratory judgment from the Court that it can place the name, brand, logos, and marks of its choosing on the #31 Car, driver uniforms, helmets, and in all merchandising and licensing rights, including a change of its name, brand, logos, and marks to "AT & T." Also on March 26, 2007, plaintiff filed a motion for a preliminary injunction now pending before the Court.

## CONCLUSIONS OF LAW

In order for the Court to grant plaintiff's motion for a preliminary injunction, the movant must show the following: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) the threatened injury to the movant outweighs any potential harm to the party being enjoined; and (4) that granting the injunction would not be adverse to the public interest. *Charles H. Wesley Educ. Found., Inc. v. Cox,* 408 F.3d 1349, 1354 (11th Cir.2005). The Eleventh Circuit has made clear that a "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establish[es] the 'burden of persuasion' as to each of the four prerequisites." *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000) (internal citations omitted). A find-

ing of a substantial threat of irreparable harm is the "sine qua non" of injunctive relief such that even if plaintiff establishes "a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Id.* Finally, "the asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Id.* at 1177 (quotations omitted).

### A. Plaintiff Has Established a Substantial Likelihood of Success on the Merits

Plaintiff moved for a preliminary injunction on two of its claims: (1) breach of the 2007 RCR Agreement & Addendum, as to which plaintiff contends it is an intended third-party beneficiary; and (2) promissory estoppel. Because the Court concludes that plaintiff has shown a substantial likelihood of success on the merits of its breach of contract claim, the Court will not address plaintiff's promissory estoppel claim.

■■■ Plaintiff is not a party to the 2007 RCR Agreement & Addendum, and therefore plaintiff must show that it was an intended third party beneficiary to this contract. *See* O.C.G.A. § 9–2–20(b) (beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract).

In order for a third party to have standing to enforce a contract under O.C.G.A. § 9–2–20(b), it must clearly appear from the contract that it was intended for [plaintiff's] benefit. The mere fact that [plaintiff] would benefit incidentally from performance of the agreement is not alone sufficient. There must be a promise by the promisor to the promisee to render some performance to a third person, and it must appear that both the promisor and the promisee intended that

the third person should be the beneficiary.

*Danjor v. Corporate Constr., Inc.*, 272 Ga. App. 695, 697, 613 S.E.2d 218 (2005) (citations omitted). The question is whether the parties' intention to benefit the third party is shown on the face of the contract. *Northen v. Tobin,* 262 Ga.App. 339, 344, 585 S.E.2d 681 (2003). The third party beneficiary need not be specifically named in the contract. *Plantation Pipe Line Co. v. 3–D Excavators, Inc.*, 160 Ga.App. 756, 758, 287 S.E.2d 102 (1981).

■■■ The Court concludes that the parties' intention to benefit plaintiff is shown on the face of the RCR Agreement & Addendum. First, the Addendum specifically names plaintiff and allows for "Cingular branding" on the headsets/helmets. Addendum ¶ 2. *Compare Am. Computer Tech., Inc. v. Hardwick,* 274 Ga.App. 62, 64–65, 616 S.E.2d 838 (2005) (finding third party beneficiary where contract expressly named third party to receive a portion of a fee) *with Danjor,* 272 Ga.App. at 697–98, 613 S.E.2d 218 (finding no third party beneficiary standing where the contract contained no generic or specific reference to the plaintiffs).

Second, the Agreement provides that despite Sprint Nextel's exclusivity, "any and all existing product licensing relationships" in the competitive category would be allowed to continue. RCR Agreement ¶ 11. According to the face of the contract, because "certain existing contractual agreements" would preclude the Driver/Owner from fulfilling specific requirements of the RCR Agreement, the Addendum provides alternatives. Addendum at 1. The Addendum provides that to the extent the Driver/Team has (1) a "sponsorship" which precludes it from complying with the Agreement, that sponsorship can be renewed (with limitations) and (2) a "licensing agreement which is part of the

aforementioned sponsorship agreements," the license can continue so long as the "sponsorship relationship" continues. Addendum ¶ 4.

Plaintiff's Sponsorship Agreement with RCR precludes the driver/team from complying with the RCR Agreement. It precludes the driver/team because plaintiff is a competitor of Sprint Nextel. Plaintiff had a "certain" and "existing" contractual agreement at the time NASCAR entered into the RCR Agreement. The promisor NASCAR made a promise to the promisee RCR to preserve and protect plaintiff's sponsorship agreement notwithstanding the exclusivity granted to Sprint Nextel. *Compare Plantation Pipe Line Co.*, 160 Ga.App. at 758, 287 S.E.2d 102 (finding an intent to benefit a third party where the plaintiff was not necessarily named but was a member of relatively small group of intended beneficiaries) *with Davis v. Phoebe Putney Health Sys., Inc.*, 280 Ga. App. 505, 508–09, 634 S.E.2d 452 (2006) (finding no third party standing where benefits were not directed to a class of people and instead only benefitted indirectly the overall general public).

Third, the Addendum provides for limitations on the sponsor should RCR elect to renew its sponsorship. The sponsor may not increase its brand position on the car or move to another team. The existence of these limitations, which specifically apply to plaintiff, supports the conclusion that plaintiff is an intended beneficiary of the contract provisions on which it relies.

Although NASCAR argues that the Addendum was to benefit RCR from a sudden loss of sponsorship, the Addendum provisions allow the "agreement" and "sponsorship relationship" to continue and to be renewed. The "agreement" is be-

tween both RCR and plaintiff, and therefore, the only way the parties to the RCR Agreement could protect RCR from a sudden loss of sponsorship was to also protect the sponsor.

Finally, NASCAR admits that "Cingular" as a competitor of Sprint Nextel may continue its branding of the # 31 Car pursuant to the RCR Agreement & Addendum. This admission further demonstrates that the sponsor [3] was the intended beneficiary of the RCR Agreement & Addendum.

The Addendum was intended to benefit plaintiff because it allows plaintiff to continue its licensing agreement and sponsorship of the # 31 Car despite Sprint Nextel's exclusivity as the sole telecommunications provider of NASCAR racing. Accordingly, the Court finds that plaintiff has standing to sue NASCAR on the RCR Agreement & Addendum as a third party beneficiary.

■ The Court having concluded that plaintiff has standing to sue on the RCR Agreement & Addendum, plaintiff must demonstrate a substantial likelihood of success on its claim that NASCAR is in breach of the RCR Agreement & Addendum. Plaintiff contends that NASCAR is in breach of the RCR Agreement & Addendum because it refuses to allow plaintiff to feature its current brand and logo on the # 31 Car.

Plaintiff's contractual right to feature its current brand and logo on the # 31 Car is found in plaintiff's Sponsorship Agreement with RCR. The Sponsorship Agreement between RCR and plaintiff gives "CINGULAR" the right, "in accordance with its status as Primary Sponsor," to designate

---

**3.** The Court addresses below the parties' dispute over whether plaintiff is limited to the "Cingular brand." However, by admitting that the Cingular brand is still permitted, NASCAR shows that it intended for the sponsor of the # 31 Car to be a third party beneficiary of the RCR Agreement & Addendum.

the "CINGULAR marks" appearing on the car. Sponsorship Agreement, Ex. B. ¶ 3. The agreement further defines "CINGULAR" as a company, not a brand—i.e., as "CINGULAR WIRELESS LLC," which is the company now known as AT & T Mobility LLC and is the plaintiff here. *Id.* at 1. In view of the fact that Cingular Wireless LLC has changed its name and adopted the AT & T logo and brand, the Court concludes that, insofar as the Sponsorship Agreement between RCR and plaintiff gives plaintiff as a company the right as primary sponsor to designate the marks that appear on the # 31 Car, that agreement authorizes plaintiff to designate its current name (AT & T) and logo (the AT & T globe) to be featured on the car.

As explained above, the RCR Agreement provides that, "[n]otwithstanding" the exclusivity afforded Sprint Nextel, "NASCAR and Nextel will allow any and all existing product licensing relationships in the Category to continue through the current term of their agreement." RCR Agreement ¶ 11. The Addendum to the Agreement further provides: "To the extent that [RCR] has a licensing agreement which is part of [a] sponsorship agreement [RCR] shall have the right to continue to license such products so long as such sponsorship relationship continues." Addendum ¶ 4.

The Court concludes that NASCAR's refusal to permit plaintiff to feature its current logo and brand on the # 31 Car likely violates these provisions. Plaintiff's "product licensing relationship" with RCR necessarily encompasses the right to display its current brand and logo on the # 31 Car; without that, the value of the license it has obtained from RCR would be greatly diminished. By permitting plaintiff's "relationship" with RCR to continue despite Sprint Nextel's exclusivity, the RCR Agreement & Addendum necessarily protect plaintiff's right to have its current

brand and logo featured on the car. By interfering with that right and not allowing plaintiff to specify the marks that are to be placed on the # 31 Car, NASCAR is likely in breach of the RCR Agreement & Addendum.

NASCAR contends that its commitment to grandfather plaintiff's sponsorship rights is confined to plaintiff's use of the "Cingular" brand and logo. NASCAR argues that on its face, the RCR Agreement & Addendum do not give RCR the right to display anything other than the Cingular brand on the # 31 Car. The text of the RCR Agreement & Addendum, however, includes two limitations on plaintiff's grandfathered sponsorship rights, neither of which suggests that plaintiff would be confined to the "Cingular" brand or logo on the # 31 Car. From the face of the contract, the restrictions are as follows: "the sponsor shall not increase its brand position on the vehicle" and "if such sponsor fails to renew with undersigned Team, Driver/Team shall not sign a subsequent sponsorship or licensing agreement in the Category." Addendum ¶ 4. If NASCAR had intended to restrict the logos and branding on the # 31 Car, it could have included such limitations in clear and unambiguous language. The absence of any reference to such a limitation on the brand or logo for the # 31 Car in the RCR Agreement & Addendum refutes NASCAR's claim that its grandfathering commitment was confined to plaintiff's use of the "Cingular" logo and brand. *See Copy Systems of Savannah, Inc. v. Page,* 197 Ga.App. 435, 436, 398 S.E.2d 784 (1990) (noting that if plaintiff had intended a phrase in a contract, it should have so stated).

Construction of a contract is a question of law for the Court based on the intent of the parties set forth in the contract. *Kaesemeyer v. Angiogenix, Inc.,* 278 Ga.App.

434, 437, 629 S.E.2d 22 (2006). If the Court decides that the language of a contract is clear and unambiguous, the Court simply enforces the contract according to its clear terms. *Id.* The Court looks to the contract alone for its meaning. *Id.* Although NASCAR makes several arguments based on conversations and documents that followed the RCR Agreement & Addendum which purportedly explain the contract language and the restrictions on branding,[4] the Court need not look to this evidence to determine the parties' intent because the RCR Agreement & Addendum are clear and unambiguous. The restriction on branding and logos is absent. *See Reuss v. Time Ins. Co.,* 177 Ga.App. 672, 673, 340 S.E.2d 625 (1986) ("Where the language of the contract is plain, unambiguous, and capable of only one reasonable interpretation, no other construction is permissible.").

NASCAR also contends that the terms of its Rule Book give NASCAR discretion to reject any car design for any reason, and thus that NASCAR's determinations as to paint schemes could never give rise to a claim under the RCR Agreement & Addendum. The RCR Agreement itself, however, incorporates the Rule Book by reference. The Addendum to the RCR Agreement states that its grandfathering provisions apply "[t]o the extent that [RCR] has a sponsorship ... which precludes [RCR] from complying with the [RCR Agreement]." Addendum ¶ 4. Therefore, the Addendum provides ·that notwithstanding the body of the RCR Agreement including the Rule Book reference, plaintiff as a pre-existing sponsor is grandfathered in as long as it does not increase its brand position on the car or change teams. To the extent the discre-

tion contemplated in NASCAR's Rule Book conflicts with NASCAR's commitment to grandfather plaintiff's sponsorship rights, the language in the grandfather clause[5] of the Addendum thus makes clear that the grandfathering commitment trumps.

In light of the above, the Court concludes that plaintiff has demonstrated a substantial likelihood of success on the merits of its breach of contract claim as an intended third party beneficiary of the RCR Agreement & Addendum.

**B. Plaintiff Will Suffer Irreparable Harm Absent an Injunction**

■ Plaintiff contends that it will suffer irreparable harm in the form of loss of goodwill, customer confusion, and loss of an exclusive period to negotiate a renewal of its sponsorship with RCR. Plaintiff claims a loss of goodwill resulting from its inability to place its current logo and brand on the # 31 Car. Plaintiff has invested approximately $150 million in connection with its sponsorship of the # 31 Car in order to build goodwill in the Cingular Wireless brand among NASCAR fans. Plaintiff has now changed its name and logo. If plaintiff is unable to feature its current name and logo on the # 31 Car, it will in effect be forced to strand the goodwill it has built up among NASCAR fans in an increasingly obsolete brand.

NASCAR argues that plaintiff's harm is not irreparable because a dollar value can be placed on plaintiff's sponsorship of the # 31 Car. However, according to plaintiff's Chief Marketing Officer Marc LeFar, unless plaintiff is permitted to transition from the "Cingular Wireless" brand and logo to the "AT & T" brand and logo,

---

**4.** Plaintiff disputes that this evidence demonstrates a restriction on the logos or branding of the # 31 Car.

**5.** It is the "grandfather clause," not the "introductory clause" of the Addendum as NASCAR contends, that permits the grandfather commitment to trump the Rule Book.

plaintiff will be paying millions of dollars to sponsor a car that is racing under an outmoded brand. As a result, the goodwill will continue to inure to a brand, "Cingular Wireless," that is of no value to plaintiff in the marketplace.

The Court agrees that the threat of stranding plaintiff's goodwill creates irreparable harm. Although plaintiff may be able to place a dollar value on its sponsorship of the # 31 Car, there is nothing the Court can do at the end of the case to return to plaintiff the goodwill that it will lose if it is unable to feature its current name and logo on the # 31 Car. *See Bell-South Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC,* 425 F.3d 964, 970 (11th Cir.2005) (" 'the loss of customers and goodwill is an irreparable injury' " (quoting *Ferrero v. Associated Materials Inc.,* 923 F.2d 1441, 1449 (11th Cir. 1991))); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,* 238 F.3d 1300, 1308 n. 18 (11th Cir.2001) ("Irreparable injury surely would be suffered by Delta by canceling a number of flights, losing customer goodwill, and losing revenues."); *Dunkin' Donuts, Inc. v. Kashi Enters., Inc.,* 119 F.Supp.2d 1363, 1364 (N.D.Ga.2000) (harm to goodwill "constitutes an irreparable injury").

Next plaintiff alleges that customers will be confused if plaintiff is unable to place its current brand and logo on the # 31 Car. Plaintiff is conducting a national campaign to transition the "Cingular" brand to "AT & T." The # 31 Car, still features the "Cingular" brand and logo, however, without any indication that Cingular is now doing business as "AT & T." According to Mr. LeFar, plaintiff has gone to great lengths to transition a well known brand, "Cingular," to "AT & T." NASCAR fans already have or are soon likely to witness this transition in television and print advertisements. However, these same NASCAR fans also see the # 31 Car race around the track each week with the "Cingular" logo; NASCAR races are the only place where the transition is not proceeding. If the # 31 Car does not reflect the transition, NASCAR fans will be confused about whether the wireless company doing business under the "AT & T" brand is in fact the same company that previously did business as "Cingular Wireless."

The Court concludes that the continued appearance of the "Cingular" brand on the # 31 Car, unaccompanied by any indication that "Cingular" now does business as "AT & T," is likely to confuse NASCAR fans. *See Duct–O–Wire Co. v. U.S. Crane, Inc.,* 31 F.3d 506, 509–10 (7th Cir.1994) (finding irreparable harm because customer "confusion ... could damage Duct–O–Wire's commercial reputation"); *Fairfield Resorts, Inc. v. Fairfield Mountains Prop. Owners Ass'n Inc.,* No. 1:06CV191, 2006 WL 2524188, at *4 (W.D.N.C. Aug.29, 2006) (concluding irreparable harm "will result from the confusion [plaintiff's] customers will face"); *Sunoco, Inc. (R & M) v. LSAA, Inc.,* No. 3:05CV239–MU, 2005 WL 2076442, at *3 (W.D.N.C. Aug.26, 2005) (finding irreparable harm because "customers will be lost and will not return ... due to the confusion generated by the debranding").

Plaintiff also claims that, absent an indication from the Court as to whether plaintiff can feature its current name and logo on the # 31 Car, plaintiff will be unable to take advantage of its exclusive period to negotiate a renewal of its sponsorship with RCR, which expires June 1, 2007. Contrary to NASCAR's assertions, witnesses for RCR and plaintiff testified that negotiations are not ongoing and will depend on whether plaintiff can place the AT & T logo on the # 31 Car. Mr. LeFar stated that absent resolution of the uncertainty of plaintiff's grandfather rights sufficiently in advance of June 1, 2007, NASCAR will

have deprived that negotiation period of any meaning. Furthermore, he stated that "because it is impossible to tell, whether in the absence of NASCAR's interference, plaintiff would be able to reach agreement on a renewal agreement with RCR or on what terms, it is impossible to calculate precisely the harm resulting from that interference." LeFar Decl. ¶ 25. The Court agrees that plaintiff's inability to exercise its exclusive right of negotiation is a form of irreparable injury. *See Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F.Supp.2d 1037, 1051 (N.D.Cal. 2004) ("where wrongful conduct deprives a plaintiff of a unique contract right, there may be an irreparable harm").

NASCAR argues that plaintiff has unreasonably delayed seeking emergency relief for several years, and this delay undercuts any allegation of irreparable harm. The Court agrees with the arguments presented by plaintiff that it has not delayed in seeking emergency relief. The situation that faces the Court today regarding plaintiff's right to place its logo and brand on the # 31 Car as the primary sponsor did not arise until the completion of the merger of AT & T Inc. and BellSouth Corporation on December 29, 2006. It would have been a waste of resources, particularly judicial resources, to seek emergency relief until after the deal was final. The following week, in January of 2007, plaintiff submitted its paint scheme proposal for the # 31 Car to NASCAR, and NASCAR rejected that proposal on January 16, 2007. Plaintiff then attempted to resolve the matter without litigation. Having been unsuccessful, plaintiff filed its complaint on March 16 and its motion for a preliminary injunction on March 26, 2007. The Court concludes that plaintiff has not delayed in seeking emergency relief and to the extent that the time from December of 2006 until plaintiff filed its motion could be viewed as a delay, the Court concludes that it does

not undercut plaintiff's claim of irreparable harm.

NASCAR claims that because plaintiff intends to continue using and heavily promoting the Cingular brand for months, there is no immediacy required to obtain a preliminary injunction. However, Mr. LeFar testified that he is "doing everything to shut the Cingular brand down." LeFar Dep. at 29. He further explained that plaintiff has a transition plan in place and that he hoped to have the transition to the AT & T brand and logo completed by the end of the summer of 2007. Based on this evidence, the Court disagrees with NASCAR that plaintiff intends to use and heavily promote the Cingular brand, thereby demonstrating no immediacy.

NASCAR also contends that plaintiff has a multitude of avenues to reach NASCAR fans, will spend $10 million in off-track NASCAR-related marketing which is intended to reach NASCAR fans, and is free to promote its re-branding in other sponsorships. However, Mike Helton, President of NASCAR, testified that NASCAR is a unique opportunity for advertisers because of the unique qualities of the NASCAR fan base and the incredible loyalty to the sport and to the people who sponsor the sport. In particular, he testified that part of what makes the sponsorship of a team in NASCAR so unique is that an advertiser has the opportunity to integrate its message into the sport itself by having its logos on the car as the car circles the track. Even though plaintiff may have other ways of promoting its transition to "AT & T," NASCAR is banning plaintiff from the *unique* opportunity of showing that transition on the car itself. *See Sw. Bell Tel., L.P. v. Moline*, 333 F.Supp.2d 1073, 1092 (D.Kan.2004) (finding irreparable injury where a restriction deprived the plaintiff of the most effective avenues to market offers to customers,

even though the plaintiff had alternative avenues for reaching customers). Finally, the Court agrees with plaintiff that the fact that it is forced to devote such large sums in an attempt to mitigate the harm caused by keeping the Cingular logo and brand on the # 31 Car further demonstrates the severity of harm plaintiff is suffering.

The Court concludes that plaintiff has shown it will suffer irreparable harm, in the form of loss of goodwill, customer confusion, and loss of the exclusive right to renew its sponsorship agreement, unless the Court issues the injunction.

## C. Balance of Harms Weighs in Plaintiff's Favor

█ NASCAR contends that granting the injunction would give plaintiff a singular exemption from the NASCAR Rules and thwart NASCAR's ability to enforce its own rules and regulate its sport. However, the Court has already found that the grandfather clause of the RCR Agreement & Addendum trumps NASCAR's discretion in the Rule Book.

NASCAR next claims that if the Court issues the injunction, NASCAR would face an immediate threat of claims by Sprint Nextel, asserting breach of its exclusive sponsorship rights granted by NASCAR in the Nextel Sponsorship Agreement. NASCAR also argues that its future ability to enter exclusive sponsorship agreements would be seriously undermined. However, the burdens NASCAR may face if the Court enforces the promises in the grandfather clause are the result of NASCAR's own making. NASCAR made a commitment to grandfather plaintiff into the sport. NASCAR cannot avoid honoring that commitment because it may lead to possible unfavorable consequences. *Int'l Casings Group, Inc. v. Premium Standard Farms, Inc.,* 358 F.Supp.2d 863, 877 (W.D.Mo.2005) (noting that the court

cannot refuse the plaintiff an appropriate remedy because the defendant would have to renege on its contract with a third party and potentially face litigation for that breach); *Ardito v. City of Providence,* 263 F.Supp.2d 358, 373 (D.R.I.2003) (holding that the burdens cited by the defendant if the court issued the injunction would result from a situation of the defendant's own making, and therefore the defendant cannot cite the possible consequences of that decision as a hardship that weighs against granting a preliminary injunction). Regardless of whether Sprint Nextel could or may bring suit against NASCAR, the Court finds that the threat of such a suit does not outweigh the actual and imminent irreparable harm plaintiff will suffer if the Court does not issue an injunction.

Sprint Nextel, who participated as amicus curiae, argues that its exclusivity and sponsorship would be greatly diminished. However, Sprint Nextel knew that its exclusivity was going to be impaired because it agreed with NASCAR in the Nextel Sponsorship Agreement to grandfather in certain competitors. Furthermore, Sprint Nextel argued at the hearing that the re-branding of the # 31 Car would cause harm to legal and marketing rights that it has paid for, and continues to pay for dearly. However, plaintiff has also paid for its rights to be the primary sponsor of the # 31 Car. Sprint Nextel argues further that allowing re-branding of the # 31 Car would substantially harm its expectancy interest in increasing the value of its exclusive sponsorship. Sprint Nextel argued at the hearing that it expected the grandfathered-in competitors to eventually retreat from NASCAR racing. However, plaintiff contends that by not allowing plaintiff to re-brand the # 31 Car, Sprint Nextel is getting more than it bargained for because it effectively boots plaintiff from the sport.

After a review of the arguments by the parties as well as amicus curiae, the Court

concludes that the irreparable injury to plaintiff outweighs any harm NASCAR or Sprint Nextel may suffer.

### D. Public Interest Favors Injunctive Relief

■ The public interest favors written contracts. *See Integra Bank N.A. v. Pearlman,* No. 6:06–CV–01952–PCF–DAB, 2007 WL 419634, at *3 (M.D.Fla. Feb. 2, 2007) (public interest is promoted by enforcing the terms of a contract); *Ardito,* 263 F.Supp.2d at 373 ("the public has [a] strong interest in ensuring . . . that, once commitments are made and relied upon, those commitments are honored"). This is particularly true where, as here, the contract governs tens of millions of dollars over several years. Similarly, the public has an interest in preventing the confusion of customers. *See Golden Bear Int'l, Inc. v. Bear U.S.A., Inc.,* 969 F.Supp. 742, 749 (N.D.Ga.1996).

In addition, "[t]he chief function of a preliminary injunction is to preserve the *status quo* until the merits of the controversy can be fully and fairly adjudicated." *Suntrust Bank v. Houghton Mifflin Co.,* 268 F.3d 1257, 1265 (11th Cir.2001) (quoting *N.E. Fla. Chapter of Ass'n of Gen. Contr. of Am. v. City of Jacksonville, Fla.,* 896 F.2d 1283, 1284 (11th Cir.1990)). The Court finds that the *status quo* here is plaintiff exercising its rights as the primary sponsor of the # 31 Car, which it has done without interference since June of 2003. The Court concludes that an injunction is necessary to permit plaintiff to continue to exercise those rights.

### E. Bond

Federal Rule of Civil Procedure 65(c) requires that an applicant for a prelimi-

nary injunction provide security against the potential effects of a wrongly-issued injunction. *BellSouth Telecomms., Inc.,* 425 F.3d at 970. The amount of the security is within the Court's discretion, and the Court may elect to require no security at all. *Id.* at 971. The Court directed the parties to discuss the bond issue, and the parties reported at the hearing that they had done so but had been unable to come to an agreement. In light of the size and resources of plaintiff, the Court concludes that there is no reasonable basis for concern that plaintiff could not satisfy any judgment that might ultimately be entered in this case. Therefore, the Court does not require plaintiff to post a bond.

### Conclusion

For the foregoing reasons, the Court GRANTS plaintiff's motion for a preliminary injunction [# 5] and defendant's motion for leave to file a supplemental memorandum [# 75]. It is FURTHER ORDERED that defendant NASCAR and its officers, agents, servants, employees, attorneys, and any persons in active concert or participation with NASCAR who receive notice of this order hereby are PRELIMINARILY ENJOINED from interfering with plaintiff's contractual right, as primary sponsor of the # 31 Car, to introduce and feature the "AT & T" logo and brand in the paint scheme of the # 31 Car in connection with the # 31 Car's participation in NASCAR's Cup Series races.

IT IS SO ORDERED.