A05A0144. AMERICAN COMPUTER TECHNOLOGY, INC.
v. HARDWICK.
(616 SE2d 838)

SMITH, Presiding Judge.

American Computer Technology, Inc. ("ACT") appeals the trial court's entry of judgment on a jury verdict against it and in favor of Clifford E. Hardwick IV, asserting that the trial court erred in failing to direct a verdict on Hardwick's claims and in failing to give a requested jury instruction. Because the evidence supported the jury's verdict and the requested instruction was not adjusted to the facts of the case, we affirm.

As ACT acknowledges, "the standard of appellate review of a trial court's denial of a directed verdict motion is the 'any evidence' standard." (Citations and punctuation omitted.) *Brackett v. Cartwright*, 231 Ga. App. 536, 538 (2) (499 SE2d 905) (1998).

> A motion for directed verdict should be granted only when there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a particular verdict. All evidence must be construed most favorably to the non-movant. Before the trial court can direct a verdict for the movant, [it] must find from the evidence that there is no evidence of any kind supporting the nonmovant's position.

(Citations, punctuation and emphasis omitted.) *Quality Control Elec. v. Electronic Security Svcs. Co.*, 225 Ga. App. 671, 671-672 (1) (484 SE2d 696) (1997).

Examined in the light most favorable to the verdict and judgment, the record shows that ACT initially retained Hardwick to represent it on a claim against the City of Atlanta for computer

services performed on the city's behalf. Hardwick, a former Atlanta city attorney, initially tried to resolve the matter without litigation, but was unsuccessful. ACT decided to sue the city, and at ACT's request, Hardwick recommended Mark Trigg of the firm of Meadows, Ichter and Trigg.

Trigg and Hardwick met with Samuel Barber, the president, chief executive officer, and one hundred percent owner of ACT, and negotiated a fee agreement for pursuit of the claim against the city. Under the terms of that agreement, Trigg's firm would charge two thirds of its standard hourly rates. In exchange for that reduction in rates, ACT agreed to pay as a contingent fee an additional ten percent of any gross recovery from the city, whether through settlement or trial. That ten percent was to be divided on the basis of six percent to Trigg's firm and four percent to Hardwick. Trigg and Hardwick testified that the four percent contingent fee was to be Hardwick's only compensation for his continuing work on the case. Trigg sent Barber a letter memorializing the fee agreement on March 7, 2001. That letter stated in part:

> In exchange for this firm's agreement to reduce our standard hourly rates, ACT has agreed that it will pay, as additional attorneys' fees, ten (10%) percent of the gross recovery ultimately obtained from the city in this case, whether through settlement or trial. This additional ten (10%) percent contingent fee will be divided between this firm (six percent) and Clifford E. Hardwick IV (four percent).

After Barber and ACT agreed to the fee structure, Trigg's firm and Hardwick began working on the case. The firm sent monthly invoices to Barber itemizing the work performed and showing Hardwick's continuing activity on the case. Barber acknowledged that he received and reviewed these invoices but did not return the fee letter for several months. Some time in June, Trigg called Barber and asked about the status of the fee letter. Barber stated that he was concerned about whether Hardwick actually would be working on the case and refused to sign the agreement unless the part referring to Hardwick's fee was struck out. Although Barber returned the letter with a portion of the reference to Hardwick's fee struck out and initialled, he did not strike out the entire provision or the provision relating to the allocation of the contingency fee between Trigg's firm and Hardwick. Trigg also testified that he asked Barber to reconsider and that Barber agreed, stated that "he had no problem with it as long as Clifford was doing what I asked him to do."

After this conversation between Barber and Trigg, the litigation proceeded, and Hardwick continued to work on the case. Trigg

testified that Hardwick's work was "very significant and instrumental in our obtaining the ultimate result we did," a settlement in the amount of $2.9 million. The city agreed to an installment payout of the settlement, with the first payment due in October 2001, the second before December 1, 2001, and the third by the end of 2001. After the city made its first payment, Trigg wrote to Barber pointing out that the firm had not been paid since June and requested that ACT bring the account current. In his letter, he recapitulated the ten percent contingency fee agreement, "which fee will be shared by this firm (6%) and Clifford Hardwick (4%)." Barber and ACT did not respond or object to this letter, but shortly afterwards forwarded the ten percent payment to Trigg's firm. However, when ACT received the second and third installments from the city, it forwarded only six percent to Trigg's firm.

Trigg called Barber to inquire about the reduction from ten to six percent and reminded him of their earlier agreement and the earlier payment of ten percent on the first installment. Barber responded "that he nevertheless — he appreciated my dilemma but that it was his view that he was not going to make any further payments to Mr. Hardwick." When Hardwick called Barber, "[h]e simply said, you have been paid and I'm not paying any more." Hardwick made a "personal appeal" for Barber to explain his refusal to pay, and Barber responded "that he might reconsider if I provided him with a narrative of the work that I had performed in the case." Hardwick prepared a lengthy letter detailing the work he had performed on the case and personally delivered it to Barber. Barber never acknowledged receipt of the letter. Several days later, Hardwick called him and asked for a response, and Barber demanded contemporaneous time slip entries of the work performed, which Hardwick could not provide because his work was performed on a contingency arrangement. This lawsuit followed.

After discovery and trial, the jury found damages for breach of contract in the amount of $76,000, prejudgment interest in the amount of $10,640, and attorney fees and expenses of litigation in the amount of $37,429.21. ACT's motion for new trial was denied, and it appeals.

1. While ACT contends it should have received a directed verdict on the breach of contract claim because "there is no written contract between the parties," Hardwick correctly points out that the contract between ACT and Trigg expressly names Hardwick as a third-party beneficiary. "[T]he beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract." OCGA § 9-2-20 (b). A third-party beneficiary has standing to enforce such an agreement "if it clearly appears from the contract that it was intended for his benefit." (Citations, punctuation

and footnotes omitted.) *Northen v. Tobin*, 262 Ga. App. 339, 344 (2) (585 SE2d 681) (2003). "While the third-party beneficiary need not be specifically named, the question is 'whether the parties' intention to benefit the third party is shown on the face of the contract.' [Cit.]" *Marvel Enterprises v. World Wrestling Federation Entertainment*, 271 Ga. App. 607, 615 (610 SE2d 583) (2005). Here, the original contract plainly shows on its face that Hardwick was intended to receive a portion of the contingency fee. He is therefore entitled to bring an action on the contract as a third-party beneficiary.

2. We next consider whether the trial court correctly denied ACT's motion for directed verdict on the breach of contract claim. ACT contends that Hardwick is owed nothing because ACT fulfilled its obligations under the contract, which it asserts provided only for an hourly rate plus a six percent contingency fee for Trigg's law firm. In so arguing, ACT relies upon Barber's alteration of one portion of the contract as dispositive of the parties' intent. This, however, is by no means the case.

Hardwick argues that other portions of the contract providing for a ten percent contingency fee and for the division of that fee between Trigg's firm and Hardwick remained unaltered, thus creating an ambiguity requiring a jury's intervention to resolve. But we need not reach that question, because ample evidence was presented to the jury that ACT ratified the original contract terms, both by silence and by performance.

"A ratification by the principal shall relate back to the act ratified and shall take effect as if originally authorized. A ratification may be express or implied from the acts or silence of the principal. A ratification once made may not be revoked." OCGA § 10-6-52.

> Slight circumstances and small matters will sometimes suffice to raise the presumption of ratification. A ratification by the principal refers back to the act ratified, and becomes effective as if originally authorized; and a ratification once made can not be revoked. Ratifying conduct can include silence, or payment pursuant to an allegedly unauthorized agreement.

(Citations and punctuation omitted.) *Pioneer Concrete Pumping Svc. v. T & B Scottdale Contractors*, 218 Ga. App. 596, 597 (462 SE2d 627) (1995). "Where a corporation knowing all of the facts accepts and uses the proceeds of an unauthorized contract executed in its behalf without authority, the corporation may be bound because of ratification. [Cits.]" (Citation and punctuation omitted.) *Holliday Constr. Co. v. Sandy Springs Assoc.*, 198 Ga. App. 20, 21 (2) (400 SE2d 380)

(1990). "[A]ccepting benefits and making payments under the contract" can result in ratification. *Lankford v. Orkin Exterminating Co.*, 266 Ga. App. 228, 229 (1) (597 SE2d 470) (2004). "Whether such ratification occurred is usually a question for a jury. [Cit.]" *Wielgorecki v. White*, 133 Ga. App. 834, 838 (212 SE2d 480) (1975).

Barber testified that he was the sole owner of ACT and the only person authorized to make major financial commitments or issue significant checks for ACT. He acknowledged that he kept a close eye on the litigation and the fee statements from Trigg, demanding adjustments and revisions to the statements. He also acknowledged that he received and reviewed fee statements which included references to the work that Hardwick was performing. The October 25, 2001 letter recapitulating the original fee agreement was never responded to or disputed by Barber or ACT. Yet another letter, in November 2001, restated the terms of the original fee agreement and was never challenged or responded to by Barber or ACT. By silently accepting the benefits it obtained from Hardwick's work and not repudiating or responding to these letters, ACT ratified the original fee agreement with respect to Hardwick. In addition, upon receipt of the first settlement installment from the city, ACT paid ten percent of the installment amount to Trigg's firm in accordance with the original fee agreement, without reservation or qualification. This too provided evidence of a ratification by ACT of the original contract.

Evidence therefore was presented from which the jury could conclude that ACT ratified the ten percent contingency fee for Trigg's firm and for the benefit of Hardwick by both silence and performance. The trial court did not err in denying ACT's motion for directed verdict.

3. ACT also contends that the trial court should have directed a verdict on the issue of expenses and attorney fees under OCGA § 13-6-11. We disagree.

> Expenses of litigation generally are not allowed as a part of damages; but where the plaintiff has specially pleaded and prayed for them, and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, litigation expenses may be allowed. A mere refusal to pay a just debt, standing alone, is insufficient to support an award of attorney fees under OCGA § 13-6-11. But such a refusal may be sufficient when it is not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive. We have previously upheld awards pursuant to OCGA § 13-6-11 which arose out of the defendant's actions in breaching the contract, where the refusal to pay a debt was not made in

good faith but was an attempt to defeat the clear intent of the contract. Where no defense exists, a defendant who forces a plaintiff to resort to the courts in order to collect a debt is plainly causing him "unnecessary trouble and expense."

(Citations and footnotes omitted.) *Fresh Floors, Inc. v. Forrest Cambridge Apts.*, 257 Ga. App. 270, 271 (570 SE2d 590) (2002).

Evidence was presented that on behalf of ACT Barber at first acknowledged the contingency fee due to Hardwick under the contract and in fact ratified that provision of the contract by making payment to Hardwick, but then reversed his position and refused to continue to honor the agreement. Asked for an explanation of this change, Barber simply stated that he was "not going to make any further payments to Mr. Hardwick." Moreover, Barber then indicated to Hardwick that he "might reconsider" if more information was provided to him, but made increasingly unreasonable demands that he knew could not be fulfilled. Barber's insistence that all references to Hardwick be struck out of the bills submitted to him by Trigg's firm also supports an inference that Barber at least attempted to remove evidence of the work performed by Hardwick on the case. Under these facts, the jury was presented with sufficient evidence to conclude that Barber's refusal to pay was not "prompted by an honest mistake . . . but by some interested or sinister motive" or "attempt to defeat the clear intent of the contract." (Citations and footnotes omitted.) *Fresh Floors, Inc.*, supra, 257 Ga. App. at 271. The trial court did not err in denying ACT's motion for directed verdict on this ground.

4. Finally, ACT complains that the trial court erred in refusing to charge ACT's Request to Charge No. 6, based upon Georgia Rules of Professional Conduct 1.5 (e), which provides:

(e) A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(2) the client is advised of the share that each lawyer is to receive and does not object to the participation of all the lawyers involved; and

(3) the total fee is reasonable.

Ga. R. & Regs. St. Bar 4-102 (d), Rule 1.5 (2005). In *Nickerson v.*

*Holloway*, 220 Ga. App. 553 (1) (469 SE2d 209) (1996), we considered the application of the similar former Directory Rule 2-107 (A), which provided:

> A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or law office unless: (1) the client consents to employment of the other lawyer after a full disclosure that a division of fees will be made; (2) the division is made in proportion to the services performed and responsibility assumed by each; (3) the total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.[1]

Hardwick correctly notes that we stated in *Nickerson*, supra, 220 Ga. App. at 553 (1), that "the purpose of this rule is to protect clients from the payment of referral fees which could unfairly inflate their bills by allowing attorneys to collect payment for little or no work, and this purpose is not implicated where the attorneys dividing the fee have both done some work on the case and there is no suggestion that the client's fee is inflated or unreasonable. [Cit.]" Id. In this case, it is not disputed that Hardwick performed substantial and effective work for the client, and this rule is therefore not applicable and a charge of its language was not warranted.

Moreover, as we also noted in *Nickerson*, these rules "provide guidelines as statements of policy, but do not provide a basis for civil liability. [Cit.]" Id. at 554, n. 1. The current rules explicitly provide:

> The purpose of these Rules is not to give rise to a cause of action nor to create a presumption that a legal duty has been breached. These Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule.

---

[1] Part III of the State Bar rules, containing the canons of ethics, ethical considerations and directory rules, was deleted in its entirety in 2001.

Ga. R. & Regs. St. Bar 4-102 (d) Preamble [18] (2005). The trial court did not err in refusing to instruct the jury in the language of State Bar Rule 1.5 (e).

*Judgment affirmed. Ellington and Adams, JJ., concur.*

DECIDED JUNE 28, 2005.

*Wayne B. Kendall*, for appellant.
*Kevin A. Ross*, for appellee.