**SECOND DIVISION**
**DOYLE, P. J.,**
**DAVIS, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.gov/rules**

**June 29, 2026**

# In the Court of Appeals of Georgia

A26A0408. CENTRAL UNITED METHODIST CHURCH OF
ATLANTA, INC. et al v. THE WEST FIRM, P.C.

DOYLE, Presiding Judge.

The West Firm, P. C.,[1] ("West") filed the instant lawsuit against its former client, Central United Methodist Church of Atlanta, Inc., ("Central") alleging breach of contract and requesting attorney fees for bad faith, stubborn litigiousness, or causing unnecessary trouble or expense under OCGA § 13-6-11. Following a jury trial in favor of West, Central appeals, challenging the denial of its motion for mistrial, the award of attorney fees, and entry of the amended final judgment after Central filed its

---

[1] The West Law Firm's principal is attorney Lisa West, who testified to events on behalf of The West Law Firm. "West" is used interchangeably in this opinion with the understanding that the law firm was the party to the contract at issue.

notice of appeal. For the reasons that follow, we affirm the final judgment and vacate the amended final judgment.

This is the second appearance of this case before this Court. See generally *The West Firm, P. C. v. Cent. United Methodist Church of Atlanta, Inc.*, 373 Ga. App. 148 (907 SE2d 233) (2024) ("*West I*"). In addition to the breach of contract claim against Central, West's original complaint stated claims of tortious interference with contractual relations and conspiracy to commit tortious interference, naming as defendants Vance P. Ross, Aurelius Freeman, Monique Mabry, James Gordon, Christopher Beal, Jacqueline Sykes, Monica Prothro, and Mildred Gunn (collectively, "the Individuals"), who were employees or committee members at Central. Central and the Individuals filed a joint answer, and in 2023, the trial court granted summary judgment to Central and the Individuals on West's claims.

West appealed, and in 2024, this Court reviewed the grant of summary judgment, reversing West's claim against Central because there remained genuine issues of material fact as to whether Central had tendered payment under the contract. See id. at 151(2). Regarding West's claims against the Individuals, this Court affirmed the trial court's grant of summary judgment because the Individuals "acted only in

their capacities as [Central's] officers and members of its leadership team, so there was no evidence of the essential element [of the tortious interference claim] that the [Individuals] were strangers to the contract." See id. at 149(1), 151–53(3), (4). The case was remanded and proceeded to a jury trial. Central now appeals.

Viewing the evidence in the light most favorable to the jury verdict, see *Rockdale Hosp., LLC v. Evans*, 306 Ga. 847, 847(1) (834 SE2d 77) (2019), the evidence at trial established that Central was governed by a Board of Trustees ("the Board"), which made decisions about the church property, administering bequeathments, and other matters. Melinda Carlisle, who was Board chair during these events in 2021, testified that there were various ministries and committees at Central that managed different departments of the church, but the Board was in charge of church property. Additionally, the "Leadership Team" consisted of various heads of different ministries or church employees such as the pastor, Ross. Neither the Leadership Team nor the pastor were given power to control church property.

To assist with its duties, the Board was empowered to enter into agreements for services on behalf of Central, including hiring legal counsel. Prior to 2021, West had done work representing Central on certain limited matters. When the previous general

counsel left, the Board engaged West as general counsel through a February 2021 retainer agreement, which called for a $5,000 retainer and charges for legal services at a reduced hourly rate, with costs or other fees paid separately.

Central is located across from Mercedes-Benz Stadium in Atlanta, Georgia, and its proximity allows it to utilize its parking lot to benefit the church by charging approximately $40 to $100 for parking during stadium events. At the time of West's representation of Central, Freeman was in charge of the parking ministry, which consisted of managing event parking and collecting fees for the church. At some point, Central members and a private party approached the Board about concerns related to Freeman's behavior and the parking ministry, alleging discrepancies between fees that were collected and totals remitted, and alleging that Freeman was aggressive and may have carried a weapon while managing some events.

The Board requested that West investigate the parking ministry, make suggestions about whether a cash-less payment system should be implemented to accurately track receipts or a private company engaged instead, and advise whether Freeman's behavior was a liability issue for Central. In mid-August 2021, the Board discussed implementing changes to the parking ministry based on West's

investigation, and Freeman (who was a Board member) reacted inappropriately to the suggestion of a new system. West prepared a report based on that meeting and findings of a background check of Freeman, which had revealed a problematic criminal history. At an emergency Board meeting later that month, West recommended immediate cessation of the parking ministry until a new protocol could be implemented to protect Central from any liability issues that could arise from mishandled funds or Freeman's inappropriate behavior. The Board imposed this event-parking moratorium, but rather than abide by it, Freeman allowed parking for an event the very next day. The Board forwarded this information to Pastor Ross seeking his input, but he did not respond.

Instead, the Leadership Team, including Pastor Ross, discussed over email West's retainer agreement and then held a meeting with Board members aside from Carlisle, at which meeting the Leadership Team decided that the pastor should select general counsel, that West's contract should be terminated within five days, and that the parking ministry should move from the Board's oversight to the Leadership Team. Carlisle testified that neither the pastor nor the Leadership Team had authority to govern the parking lot or facilities management under church rules.

On October 16, 2021, James Gordon, who was the finance chair, requested an invoice from West for any outstanding legal services. On October 20, 2021, West provided an invoice for $9,391, which was the total legal services performed by the firm but not covered by the $5,000 retainer; West's response noted that church administrator Mildred Gunn normally handled those invoices. Although West continued to handle legal issues for the Board as they arose after the parking ministry issue, by early November, West tendered a letter of resignation as general counsel, effective December 31, 2021. Additionally, having not received a check or any response to the invoice, West followed up by email on November 18 and November 30; the November 30 email stated that if no response was received to the request for payment of the invoice, West would assume that the firm was not going to be paid for the outstanding fees and would proceed accordingly.

Carlisle, who had been copied on West's November emails along with Gunn and Gordon, testified that Central normally prepared checks twice a month, and if a check request was received, it could be processed and paid quickly, generally within 48 hours or occasionally the same day. Carlisle testified that it was very unusual to have an invoice remain unpaid for as long as West's October 20 invoice, and she was

surprised by West's November 18 and November 30 requests for a payment update. Due to West's November 30 email, Carlisle emailed Gordon and Gunn, asking that they complete a check request for the invoice, which Gunn had done in the past; however, Gunn responded that it was Carlisle's job to complete the check request, which Carlisle did early on December 2, asking that it be processed that day. Gunn instead retrieved the check request from the secretary and marked it as "incorrect" in several places, emailing a copy to Carlisle, who responded to Gunn the next day in an email detailing the discrepancies between Gunn's treatment of West's October 20 invoice and previous check requests.

On December 14, 2021, having received no information about the invoice nor the payment itself, West emailed Gordon and Gunn, alerting them that she would pick up a check for $9,391 on December 16 at 4:30 p.m., and requesting confirmation within the next eight hours that the check would be ready for pick-up. No one responded as West requested, and on December 16 around noon, Gunn forwarded West's email to Pastor Ross, Gordon, and the Leadership Team members, including a message that "[m]y supervisor, … [Pastor] Ross, … has instructed me to prepare the check listed below for Mrs. Lisa West to pick up this evening. I have shared with

7

Pastor Ross that I would ask the church's leadership if I need to provide any additional information to complete this assigned task." Pastor Ross responded, "[j]ust to clarify, as Senior Pastor I do not sign checks for approval. I can, and do, affirm that this should be paid and am glad Rev. Gunn seeks approval for lay leadership." One Leadership Team member responded that she disagreed with the payment because she understood that they were looking into West's contract.

Gunn testified that a check was prepared and posted on the front window of the office,[2] but West did not get the check. West testified that she did not believe that a check had been prepared because no one had confirmed that it was ready for pickup. West filed the instant suit on December 17, 2021, and notified Central that she was terminating the retainer agreement immediately rather than on December 31; West testified that payment was not expected given Central's actions leading up to December 16, including the Leadership Team's treatment of the firm following the parking ministry issue and the church's delay and lack of communication regarding the outstanding invoice payment.

---

[2] A security guard testified that the office was in an area accessible only with his assistance to enter several locked entry points.

In January 2022, Central sent West an offer to settle, which included a $9,391 check dated December 16, 2021, which offer provided that by negotiating the check, West agreed to dismiss with prejudice its pending claims against both Central and the Individuals. Central's settlement offer, which contained a list of all the pending claims at that time (both between West and Central and West and the Individuals) and West's counter-offer to settle its claim against Central (but not claims against the Individuals) in exchange for the January 2022 check, were both presented in unredacted form to the jury as requested by Central; West objected to this, but the court allowed the documents with an accompanying limiting charge:

> In the course of litigation, parties come and go. ... In this case, that happened. Some parties came and some parties went. And that really shouldn't concern you as to why. Okay. That's something that has no bearing on how you decide this case, but I want you to know that it happened, and I want you to know not to focus on that because that's not relevant to these issues, but it did happen.

West testified that she could not negotiate the January 2022 check at that time because of "the conditions" that were placed on it by Central. West testified that by the time of trial, Central had never offered to pay the $9,391 without conditions. The 2022 check stayed in West's files until October 2023, at which point West testified

that the firm "had the option of appealing or just dropping" the case, so West decided to cease litigation and cash the check because "the conditions" were no longer present. West testified that she deposited the check on October 2, 2023, and the check cleared the next day. On October 4, however, Central reversed the payment, resulting in bank fees for the firm.

On cross-examination, Central asked West, "You said [']I cashed the [2022] check in October 2023,['] right? Because the case was over, right? Isn't that what you said?" West agreed that the firm had, and Central asked, "But how was the case over in October 2023? I don't think I'm clear on how you came to that conclusion." West's attorney objected and after a bench conference and continued cross-examination, Central again asked West why she believed that the case was "over" prior to cashing the settlement check. In light of the bench conference, West did not know how to answer the question, and the court instructed,

> [w]ell, ladies and gentlemen, the case is obviously pending or you wouldn't be sitting there. It's been pending since 2022, or you wouldn't be sitting there. So the case is not, as we sit here, over, right? It's not over until you reach your verdict and return it in open court. So let's start with that and then see where we go.

West explained that after filing the notice of appeal, but before paying fees for filing or the record, she decided to "take the L" because she was tired. She explained that Central had claimed that it was not liable for breach of contract because West had possession of the settlement check, but then when it was negotiated, Central "went and reversed the check, and I didn't really have a choice then. So I appealed and the Appellate Court agreed with me, and that's why we're here today." Central did not object and essentially repeated the same question about the timing of the appeal versus West's check negotiation. West explained, ending "again, the church reversed the check. So I didn't — I didn't have a choice, and I went ahead and appealed and the court agreed — the Appellate Court agreed with me, and that's why we're here." Central did not object.

Cross-examination continued about why West did or did not cash the check at various periods between January 2022 and October 2023, and Central asked again why West did not agree to dismiss the appeal before attempting to negotiate the check, and why West believed the check was still negotiable after a year and a half. West repeated her earlier answers about the appeal process, ending with "And as I said, the Court

of Appeals agreed with the West Firm and reversed." At that point, Central moved for a mistrial, which the trial court denied, instead providing an instruction to the jury.

The court instructed the jury about OCGA § 13-6-11, explaining what the attorneys were trying to prove with West's testimony, and then the court instructed that the appellate court held that a jury question existed as to whether or not Central had tendered payment to West. Central objected to the instruction, arguing that a mistrial was necessary because "the jury, right now, believes that there was a Court of Appeals' decision that was resolved in her favor when, in fact, it was not." The trial court admonished Central for making that statement during its objection and denied the motion. West testified that the firm had requested that Central reissue the check three times, but Central refused.

At the conclusion of the evidence, the jury found in favor of West, awarding $9,391 "plus legal interest" on its breach of contract claim, finding evidence of bad faith, stubborn litigiousness, or unnecessary trouble or expense, and awarding $214,205.77 attorney fees and $17,794.23 in litigation expenses. The trial court entered this award as the final judgment on July 25, 2025. On August 4, Central filed its notice of appeal, but eight days later, the trial court entered an amended final

judgment, adding prejudgment interest to the breach of contract claim award in the amount of $11,762.93. On August 22, Central filed an amended notice of appeal from both the July 25 final judgment and the August 12 amended final judgment.

1. Central argues that the trial court abused its discretion by denying its motion for mistrial after West testified that it had prevailed in the 2024 appeal. We disagree.

"When ruling on a motion for mistrial, a trial court is vested with broad discretion, and this Court will not disturb the ruling absent a manifest abuse of discretion." *Ga. Dep't of Corrs. v. Couch*, 312 Ga. App. 544, 548(2) (718 SE2d 875) (2011). See *Firestone Tire & Rubber Co. v. King*, 145 Ga. App. 840, 843(2) (244 SE2d 905) (1978) ("The trial judge in passing on motions for mistrial has a broad discretion, ... which will not be disturbed unless manifestly abused. Unless it is apparent that a mistrial is essential to preservation of the right of fair trial, the discretion of the trial judge will not be interfered with.") (quotation marks omitted).

As noted above, Central questioned West at great length regarding the events surrounding its attempt to cash the 2022 settlement check before West mentioned that the appeal was resolved in the firm's favor. Although that statement was improper, the trial court did not abuse its discretion in denying the motion for mistrial

on this record. Based on Central's repeated elicitation of the same testimony without immediate objection, Central's own more prejudicial reference to the appellate decision in front of the jury, and the trial court's appropriately tailored limiting instruction, we discern no abuse of discretion. See *Clack v. Hasnat*, 354 Ga. App. 502, 507(3) (841 SE2d 210) (2020) (overruled on other grounds by *Miller v. Golden Peanut Co., LLC*, 317 Ga. 22, 29(1)(b) n. 8 (891 SE2d 776) (2023)). See also *Wellstar Health System, Inc. v. Sutton*, 318 Ga. App. 802, 804(1) (734 SE2d 764) (2012) ("'It is a well-settled appellate rule that one cannot complain about a ruling of the trial court which the party's own trial tactics or conduct procured or aided in causing.'"). The instruction provided necessary context to the jury and properly framed the prior appellate decision. See *Clack*, 354 Ga. App. at 507(3). The trial court may not have explicitly instructed the jury that West's statement did not mean that the jury should rule in favor of West (arguably serving to reduce any prejudice by not repeating the offending testimony), but the instruction implied that West's statement that this Court "agreed" with her was wrong by explaining the actual outcome of the appellate decision. Certainly the trial court's denial of the motion did not result in the lack of

a fair trial for Central. Accordingly, the trial court did not manifestly abuse its discretion by denying the motion for mistrial.

2. Central argues that the evidence was insufficient to support the attorney fee award under OCGA § 13-6-11. We disagree.

> Attorney fees are recoverable under OCGA § 13-6-11 when a party has acted in bad faith, has been stubbornly litigious, or has subjected the other party to unnecessary trouble and expense. The issue of attorney fees under OCGA § 13-6-11 is a question for the jury, and an award will be upheld if any evidence is presented to support the award[.]

*Health Servs. of Cent. Ga., Inc. v. Wanna*, 373 Ga. App. 642, 657–58(4) (908 SE2d 41) (2024) (citation modified).

(a) First, Central contends that there was no evidence of bad faith on its part because there was a bona fide dispute regarding whether it had breached the contract or tendered payment.

"Questions concerning bad faith under this statute are generally for the jury to decide, and the trial court may grant judgment as a matter of law on such issues 'only in the rare case where there is absolutely no evidence to support the award of expenses of litigation.'" *Hewitt Assocs., LLC v. Rollins, Inc.*, 308 Ga. App. 848, 853(3) (708

15

SE2d 697) (2011). See also *Harris v. Tutt*, 306 Ga. App. 377, 379–80(3) (702 SE2d 707) (2010) ("'[T]he existence of a bona fide controversy will not defeat a claim for attorney fees under OCGA § 13-6-11 when bad faith is an issue.'"); *Burlington Air Express, Inc. v. Ga.-Pac. Corp.*, 217 Ga. App. 312, 313 (457 SE2d 219) (1995) ("[D]espite the existence of a bona fide controversy as to liability, a factfinder may find that defendant acted in the most atrocious bad faith in his dealing with the plaintiff.") (citation modified). Central presented to the jury its argument that a bona fide controversy existed because no one refused to pay the invoice, the regular process for issuing a check failed, and the check was available for pickup, and the jury was not persuaded. These arguments do not demand a ruling in Central's favor as a matter of law. Moreover, the jury was authorized to discredit Central's contention that the failure to pay the invoice in a timely manner was due to improper requests or a misunderstanding rather than obfuscation or malfeasance. See *Hewitt Assocs.*, 308 Ga. App. at 853(3). Whether or not Central actually made the check available on December 16 was a question for the jury, and Central's credibility regarding this contention was undercut by the evidence of its acts and statements made during that time.

It is true that

> [a] mere refusal to pay a just debt, standing alone, is insufficient to support an award of attorney fees under OCGA § 13-6-11. But such a refusal may be sufficient when it is not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive. We have previously upheld awards pursuant to OCGA § 13-6-11 which arose out of the defendant's actions in breaching the contract, where the refusal to pay a debt was not made in good faith but was an attempt to defeat the clear intent of the contract. Where no defense exists, a defendant who forces a plaintiff to resort to the courts in order to collect a debt is plainly causing him "unnecessary trouble and expense."

*Am. Computer Techn., Inc. v. Hardwick*, 274 Ga. App. 62, 66–67(3) (616 SE2d 838) (2005) (citation modified). But the evidence presented in this case did not constitute a mere refusal to pay as a matter of law.

The Leadership Team's discussions regarding termination of West's retainer agreement; its attempted takeover of the parking ministry from the Board; Pastor Ross's refusal to meet with Carlisle regarding West's parking ministry report; Carlisle's and Gunn's discussions regarding the proper time frame for requesting checks, and the deviation therefrom in West's case; the failure of Central to respond to West's repeated inquiries about payment status and requests for payment,

including the failure of Central to alert West to the alleged availability of a check on December 16; and the failure to allow West to negotiate the check at the conclusion of the claims against the Individuals, support the jury's determination that Central's failure to pay the invoice in 2021 was the result of an "interested or sinister motive" rather than an honest mistake regarding its duties under the retainer agreement. See *Hardwick*, 274 Ga. App. at 66–67(3). Because this was sufficient evidence of bad faith, we need not review whether Central was stubbornly litigious or caused West unnecessary trouble and expense.

(b) Central also argues that the evidence relied upon by West to support its OCGA § 13-6-11 claim improperly centered on West's claims against the Individuals rather than its claim against Central. This argument is without merit. The evidence presented by West at trial related to the Individuals in their roles as employees or committee members at Central. Their acts that obstructed payment of West's fees occurred in response to West's advice regarding the parking ministry and Freeman's behavior while managing that ministry. Accordingly, this evidence was appropriate to the determination of the question of fees because the acts in question were properly attributable to Central. Compare *Shamblin v. Corp. of the Presiding Bishop of the Church*

*of Jesus Christ of Latter Day Saints*, 352 Ga. App. 870, 878(3) (836 SE2d 171) (2019) (holding that the allegedly negligent driver was not an agent of the church).

Central's argument that the law of the case barred any evidence related to the parking ministry dispute or the Individuals' actions is without merit. This Court ruled that the Individuals were not strangers to the contract and therefore could not tortiously interfere with the contract. See *West I*, 373 Ga. App. at 149(1), 151–53(3), (4). Aside from that holding, the acts of the Individuals were relevant to the issue of whether Central breached the contract and whether it engaged in bad faith, was stubbornly litigiousness, or caused unnecessary trouble or expense related to the retainer agreement and payment of the invoice. Therefore, this argument is without merit.

3. Central argues that the trial court abused its discretion by prohibiting it from presenting evidence of the dismissal of West's claims against the Individuals or about the trial court's grant of fees pursuant to OCGA § 9-15-14 to the Individuals after West opened the door. We disagree.

We review a trial court's decision regarding the admission or exclusion of evidence for an abuse of discretion. See *Steed v. Fed. Nat'l Mtg. Corp.*, 301 Ga. App.

801, 807(1)(b) (689 SE2d 843) (2009). See also *Level One Contact, Inc. v. BLJ Enters., LLC*, 305 Ga. App. 78, 82(2) (699 SE2d 89) (2010) (reviewing limitations on the scope of cross-examination for an abuse of discretion).

Contrary to Central's argument, West did not open the door to evidence about its claims against the Individuals. West instead presented evidence about the acts of some of the Individuals in their roles as Leadership Team members or Board members during the parking ministry investigation and the effect of those actions on Central's payment of West's 2021 invoice. As detailed above, this evidence was probative of West's claims. See *Level One Contact*, 305 Ga. App. at 82(2).

On the other hand, Central's contention that it should have been able to introduce evidence that the court granted attorney fees to the Individuals under OCGA § 9-15-14 was not germane or probative. That Code section grants fees for actions after a claim arises, and therefore, such evidence had no bearing on the acts alleged to have constituted the underlying breach of contract claim or bad faith in the underlying transaction. See, e.g., *Trotter v. Summerour*, 273 Ga. App. 263, 267(2) (614 SE2d 887) (2005) (discussing the appropriate application of attorney fees under OCGA § 9-15-14 as compared to OCGA § 13-6-11). Additionally, a list of West's

claims against the Individuals was tendered into evidence via the settlement offer letter and counter-offer, so the jury was aware of what those claims had been. And even if the trial court had allowed testimony that this Court affirmed the dismissal of West's claims against the Individuals, the determination that the Individuals were not strangers to the contract cut against Central's contention that the Individuals' actions were not connected to West's remaining claim of breach of contract. Thus, Central has failed to establish that the court abused its discretion in barring such evidence.

4. Central contends that the trial court erred by allowing West to obtain fees under OCGA § 13-6-11 for West's claims against the Individuals and that the trial court abused its discretion by barring cross-examination related thereto. We disagree.

Pursuant to OCGA § 13-6-11, a "party is entitled to recover attorney fees only for that portion of the fees that are allocable to the attorney's efforts to prosecute a successful claim." *Davis v. Whitford Props.*, 282 Ga. App. 143, 146(2) (637 SE2d 849) (2006) (citing *Premier Cabinets v. Bulat*, 261 Ga. App. 578, 582(5) (583 SE2d 235) (2003)). Moreover, "'an award of attorney fees under OCGA § 13-6-11 is to be affirmed if there is any evidence to support it.'" *Davis*, 282 Ga. App. at 145(2).

West claims it incurred fees under OCGA § 13-6-11 as a result of Central's bad faith for failure to pay the 2021 invoice for $9,391, which Central owed under the retainer agreement, resulting in the instant lawsuit. Prior to trial, Central raised the issue of erroneously included fees in West's OCGA § 13-6-11 invoice, and the court instructed West to carefully remove any amounts related solely to its claims against the Individuals, noting that the court would also review the invoice prior to submission to the jury.

West submitted amended OCGA § 13-6-11 invoices for a total of $257,198.60 for attorney fees and $17,794.23 in costs, which included $69,503.50 based on amounts billed by DuBose Trial Law, LLC, for work completed between June and July 2025. West's amended OCGA § 13-6-11 invoice included 163.1 hours of work completed between December 17, 2021 and October 2, 2023, totaling $73,395 for work prior to *West I*, and the invoice included 254 hours completed after *West I*, totaling $114,300 in fees. The invoice did not explicitly include time billed for any of West's claims against the Individuals or preparation for defending against the Individuals' post-appeal motion for OCGA § 9-15-14 attorney fees. West also testified that the firm was careful to remove any fees attributable solely to claims not before the jury.

During trial, Central again raised the issue of improper fees in the amended OCGA § 13-6-11 invoices, but the trial court instructed Central to cross-examine West about the entries in question and argue to the jury that the amounts were not appropriate. Central agreed with this ruling and cross-examined West on several line items; it made no further objection to the submission to the jury of any specific item. In its verdict, the jury awarded $17,794.23 in costs and $214,205.77 in attorney fees — $43,000 less than the total fees requested by West.

Central now argues that 29.5 hours billed by West were based on work completed exclusively for a protective order in relation to West's claims against the Individuals and that 135.9 hours billed by West were "questionable." Again, Central failed to raise an objection to any specific item at trial. See *Davis*, 282 Ga. App. at 146–47(2). Central also claims that its inability to cross-examine West about West's claims against the Individuals hampered Central's ability to establish that many of the fees were not related to the claim against Central. This contention is belied by the jury's reduction of the total amount of fees awarded. Additionally, as thoroughly explained above, many of the issues surrounding West's claims against the Individuals overlapped West's argument that Central breached the contract. And "fee separation

is not required if the evidence shows that the claims were so 'intertwined' that work performed in connection with other claims was necessary as well for the claim on which fees were allowed." *Eagle Jets, LLC v. Atlanta Jet, Inc.*, 347 Ga. App. 567, 574-75(2)(b) (820 SE2d 197) (2018) (quotation marks omitted). Thus, because there was some evidence to support the jury's attorney fee award under OCGA § 13-6-11, it is affirmed.

7. Finally, Central argues that the trial court erred by awarding prejudgment interest in its amended final order that was entered after Central filed its notice of appeal. We agree to the extent that the trial court lacked jurisdiction to enter the amended final order.

In *MARTA v. Doe*, 292 Ga. App. 532 (664 SE2d 893) (2008), this Court explained that

> Georgia law is clear that the filing of the notice of appeal operates as a supersedeas and deprives the trial court of the power to affect the judgment appealed, so that subsequent proceedings purporting to supplement, amend, alter or modify the judgment, whether pursuant to statutory or inherent power, are without effect.

Id. at 539(4) (punctuation omitted). Accordingly, the trial court lacked jurisdiction to enter the August 12 amended final judgment, and thus, we vacate that order but note that the issue may be addressed by the trial court on remand. See id.

*Judgment affirmed in part and vacated in part, and case remanded with direction.*

*Davis, J., and Senior Judge C. Andrew Fuller concur.*